*Maguire* vs. *Conran.—McLean* vs *Rutherford.*

## McLEAN *vs.* RUTHERFORD.

1. Where a person undertakes, without reward, to sell and dispose of the property of another, in the same manner as though it was his own, he is liable only for gross negligence, and is not bound, under such a contract, "to dispose of the same as a prudent man would of his own."

2. Where, under such a contract, a person undertakes to drive the horses of another to a distant market, and there sell them as he would his own, and he is taken ill by the way, and so unable to take charge and dispose of them in person, he may employ an agent for such purpose, without incurring any additional liability.

3. A party cannot give in evidence, in his own favor, his own declarations, when not made in the presence of the other party.

APPEAL from Randolph Circuit Court.

Davis, *for Appellants*, insists—

1. That the evidence of Granville Wilcoxson ought to have been excluded from the jury.

2. That a new trial ought to have been granted.

3. That the instructions of the court, asked by the plaintiff, ought not to have been given.

4. That upon the facts proved, the plaintiff had no right to a recovery.—3 Mo. Rep., 317.

As to the powers of the agent, see 6 John. Rep., 69, Van Allen and Another *vs.* Vanderpool et al.; 6 Cowen, 186, Corlies *vs.* Cumming.

CLARK, *for Appellee*, insists —

1. That the defendant was the agent or bailee of the plaintiff, and as such was bound for at least ordinary diligence; and that, from the evidence in this cause, the jury were authorized to find that he had not used ordinary prudence in the sale and disposition of the plaintiff's property; and that, by his negligence, the sale and proceeds of said horses were lost.— 8 Story on Bail, 296, 7; 4 Bibb, 282; 2 Bibb, 399.

2. That, notwithstanding the defendant may have used the same care and diligence in the sale and management of the plaintiff's horses, that he did with his own, he is liable, unless that was such as a prudent man would use.— Story on Bail, 15, 16, 46, 7.

3. That the evidence shows sufficiently clear that the plaintiff called upon the defendant to account before suit was brought.

4. The instructions for the plaintiff were well given, and are sustained by the evidence in the cause, and by law.

5. But if this court should consider that the defendant in this case was bound to use slight diligence only; still the judgment ought to be affirmed, as the case, from the whole of the instructions given, was presented to the jury upon that principle.— Story, 46, 7; Chitty on Contracts, 144.

TOMPKINS, *Judge, delivered the opinion of the Court.*

Shelton Rutherford brought his action in the Circuit Court of Randolph county, against Charles McLean, and having obtained a judgment against him, McLean prosecutes this appeal.

It appeared in evidence, that in December of the year 1838, the defendant, Charles McLean, was about to leave his place of residence in Randolph county, with a drove of mules and horses for the southern market.

A witness of the plaintiff stated, that, on the morning when the defendant started, he assisted the plaintiff, a neighbor of the defendant, in driving to the defendant's place of residence seven horses, which the defendant received into his drove. The witness said, he knew nothing about the terms on which the defendant received the horses from the plaintiff; that he heard the plaintiff say to the defendant, at the same time, that he wanted him to sell the horses for some price, that he wanted money and must have it, and did not wish him to return the horses. This witness believed the horses to be of "*various values, ranging from sixty to eighty dollars.*"

Another witness of Rutherford, the appellee, stated, that some time after the return of the defendant from the South, he started, in company with the plaintiff, to the house of the defendant, and that before they arrived there, they found the defendant at the house of a neighbor. The witness left them together, and pursued his own business. On his return he found the plaintiff and defendant at the house of the defendant, and there, he stated that, he heard a conversation betwixt them, something about the horses taken away by the defendant for the plaintiff, but he

did not recollect the particulars. The plaintiff then asked the witness to state whether he knew, from the plaintiff's statements, before they went to the house of the defendant, what was the business of the plaintiff at the defendant's house.

The counsel of the defendant objected to this question, and excepted to the opinion of the court overruling the objection. The answer of the witness not being satisfactory, the plaintiff asked him, if he had not at the same time told him that he was going to try to settle with the defendant. This was also objected to by the defendant, but the court allowed the question to be put, and the defendant excepted. To the last question put and excepted to as aforesaid, the witness answered, that while they were on their way to the defendant's house, the plaintiff stated that he wished to have a settlement with the defendant, and that the defendant was not present. The plaintiff then asked the witness what he inferred, from what the plaintiff said whilst they were going to the defendant's house, was the business of the plaintiff there. The question being objected to, the court permitted it to be answered, and the witness stated, that his inference was, that the plaintiff desired to have a settlement with the defendant, but he denied that he had heard the plaintiff request any settlement with the defendant, but said, he had heard the plaintiff make the statement when they were going to the house of the defendant; the witness stated that he did not hear the plaintiff make any express demand of a settlement with the defendant about the matter, nor did he hear the plaintiff make any express demand of the horses, but heard conversation in relation to the defendant's expedition to the South, and to some unsettled matter between them in relation to the trade to the South.

The defendant then introduced his witnesses, one of whom stated, that he sent three mules with the defendant, to be sold at the same time with the plaintiff's: and that, when the defendant was about to leave home with his drove, he heard the plaintiff, in a conversation with himself and one Smith, now dead, as to the terms on which the defendant was taking stock for others, say, that he had delivered his horses to the defendant to do with and dispose of as he would do with his own; and that the plaintiff further remarked, in the same conversation, that whatever the defendant did, good or bad, he would be satisfied with.

Another witness, but son of the defendant, testified also, that the plaintiff had given the defendant authority to sell and dispose of the horses as his own.

This last witness, and another who accompanied the defendant, stated, that the plaintiff's horses were in low order when they were put into the drove; that at St. Charles they were detained by the ice running in the Missouri, and drove the horses down the river below St. Charles, for the purpose of getting food conveniently for the horses, where one of the plaintiff's horses had his thigh broken by a fall (as was supposed) on the ice; that the drove, consisting of about ninety head, sixteen or twenty of which only were horses, and the rest mules, passed through Kentucky and Tennessee, into Alabama and Mississippi; that the defendant, about the time he crossed the Tennessee line, became indisposed, and was unable to attend personally to his business; that when they arrived at Pickens, in Alabama, but few of the stock had been disposed of, and those sold were mostly mules, sold on credit, and that none of the plaintiff's horses had been sold; that

there the defendant exchanged two of the plaintiff's horses for mules, and also two of his own that the plaintiff's horses were thin when they were put into the drove, and had become too lean to be saleable, and the mules were considered more saleable; that the defendant went thence to Decatur, in Mississippi, and the four mules escaped and were never afterwards found, though search was made. At Decatur, defendant employed one Adams to assist him in disposing of the stock. The defendant finding it impossible to sell the stock for good money, sold, betwixt Decatur and Pickens, several head of it for Decatur money, amongst them two of the plaintiff's horses. The Decatur money was not current except in the vicinity of the bank, where it would be taken for travelling expenses and in ordinary transactions. That he sold the remaining part of the drove through an arrangement with the bank, agreeing to take a bill of exchange drawn by the bank on a house in New Orleans.

All the Decatur money previously received was deposited in the bank, and that also was included in the bill of exchange. This bill was for $6,700: the draft was protested on presentment. The defendant's agent returned to Decatur about the 1st of March, 1839; there he, the son of the defendant, made a new arrangement with the bank, the officers assuring him that another bill would be accepted, if it were not presented before the 20th of May then next.

This bill was also protested, and left to be sued on, or collected in any way that might be most proper. The witness said, the draft on New Orleans was all lost; that defendant had not received any thing on it; that the defendant was taken sick from the time he crossed the Tennessee line, and continued to be too much indisposed to transact much business himself.

That the defendant sold his drove for Decatur money because, at that time, the bank had been drawing on Mobile, and had advertised to draw on New Orleans in May then next. This witness further stated, that on his return from the South, he called at the plaintiff's house, and told him, he believed all was lost, to which the plaintiff replied, that he was satisfied the defendant had done the best he could, and that he had delivered his horses to the defendant to do as he could with his own.

The plaintiff then asked the court these instructions:—

1. If the jury believe the plaintiff delivered to the defendant any number of horses to be carried to the South, and sold for money, and the money to be returned to the plaintiff; and that the plaintiff, after the defendant returned, had applied to the defendant for a settlement, and that the defendant had not paid or accounted for said horses, they will find for the plaintiff the worth of said horses, deducting a reasonable sum for expenses and the trouble of selling.

2. That if the horses were given to the defendant to sell or dispose of, the defendant is bound, under such a contract, to dispose of the same as a prudent man would of his own.

3. That the defendant had no power, unless given him by contract, to depute or employ any other person to dispose of the stock for the plaintiff, unless it was by the consent of the plaintiff, either express or implied.

The plaintiff asked other instructions, which it is not thought material to

notice. All of them were objected to, and the decision of the court, overruling the objections, was excepted to.

All the instructions asked by the defendant being given, it becomes necessary only to inquire whether those given to the plaintiff were exceptionable.

The first instruction assumes, that evidence was given that the defendant. undertook to sell the horses of the plaintiff for money, and to return the money to the plaintiff. There is no evidence on the record of any such agreement made by the defendant. The plaintiff's witness stated, that the plaintiff told the defendant, when the horses were delivered, that he wished them to be sold for some price; that he wanted money and must have it, and did not wish him to return the horses.

The positive declaration of the plaintiff, that he did not wish the horses to be returned to him, prepares us to believe very readily, that the two witnesses of the defendant were correct in their statement of the contract, that the defendant would do with and dispose of them as he would of his own. The witness, Collins, who sent mules to be sold by defendant, stated also, that on the day the defendant departed with his drove, he heard the plaintiff tell Smith (who also had sent a horse) that he had sent his horses with the defendant to do with as he could with his own, and that whatever he did, good or bad, he would be satisfied with it. The first instruction, then, was erroneously given.

The second instruction assumes it to be law, that the defendant, when he undertook to sell the plaintiff's horses as he would his own, was bound to use the diligence of a prudent man. Sir William Jones says, that when a man undertakes to do work for hire without any special agreement as to the degree of diligence, "In whatever point of view we consider this bailment, no more is regularly demanded of the bailee than the care which every prudent man takes of his own property." (See Jones on Bailments, p. 104, title, "Hiring of work," and p. 109.) The evidence in the cause induces a belief, that the plaintiff had great confidence in the integrity of the defendant; that he considered it a favor to be able to get the defendant to receive his horses into the drove; and at that season of the year (in December) few honest men would be willing to undertake to drive horses to a distant market, except on a special contract. The plaintiff seems to have been profuse of his expressions of confidence in the integrity of the defendant, not only before he knew the result of the business, but even afterwards, if the testimony of the son of the defendant is to be credited.

On a special contract like this, it is difficult to conceive that any thing, short of such gross negligence as would raise a presumption of fraud, could make the defendant liable; and it would be difficult to presume fraud, where the defendant was equally loser with the plaintiff. All the authorities cited by the plaintiff turn on the degree of diligence required of a bailee for reward, where no special contract is made, except one, viz., Francis *vs.* Castleman, 4 Bibb, 282. The defendant had taken leather to sell for the plaintiff, and it was put in his cellar with his own, and lost by fire. His plea was adjudged bad, because he did not aver that he had used proper diligence to sell it, and had failed.

Here the general issue was pleaded, and, consistently with this authority, the

plaintiff might have asked the court to tell the jury the defendant was bound to prove he had used the same diligence to sell the plaintiff's property as to sell his own.   The court erred in giving this instruction.

The third instruction is an abstract proposition, which cannot be denied, but the question here is, whether, by the terms on which the plaintiff's horses were received, he did not authorize the defendant to employ an agent.   The defendant received the horses to be disposed of as his own.

His ill-health compelled him, the witnesses state, to employ an agent; they also state that it became necessary to employ a man who knew the country better than they did.

This third instruction, then, seems to have been wrongly given.

Three other instructions were given for the plaintiff, to which the defendant excepted, but as they all turned on negligence, or supposed negligence, of the defendant, in the sale of the horses for bad money, and the want of diligence in collecting, it seems to be a sufficient answer, that the defendant appears, by the testimony, to have lost his own money too, and therefore the instructions are wrong.

The plaintiff also, under the direction of the court, drew from his own witness the statements made by himself to the witness in the absence of the defendant, to prove that he, plaintiff, had demanded a settlement with the defendant before this suit was brought; and the witness was also directed to tell, what he inferred was the business of the plaintiff at the house of the defendant, when they were going there together.   And the admission of this evidence, it is contended, is right, because it is said the plaintiff's declarations and the witnesses inferences were *pars rei gestæ.*

I understand, that if A kill B, the slayer may give in evidence his declarations and conduct on the occasion, to prove himself innocent of maliciously shedding the blood of his fellow creature.   Because, say the books, his declarations on the occasion, and his whole conduct, are *pars rei gestæ;* for, by the manner of the slayer on the occasion, we arrive at our conclusions as to his intentions.   But here the thing to be proved was, that Rutherford demanded a settlement of McLean; and the thing the parties were doing when Rutherford required the witness to testify as to his statements and the inferences of the witness, was to ride along the road.

It appears to me a very awkward way to find out whether Rutherford afterwards demanded a settlement.

For what reasons such questions can be asked, is not obvious to me.   The witness stated, he heard the plaintiff talking to the defendant about the expedition to the South, and some unsettled account between them in relation to the trade to the South, and this alone was sufficient to satisfy a jury, a little acquainted with the nature of man, that the settlement had been demanded.

I cannot imagine a case in matters of contract, where a plaintiff ought to be allowed to establish his demand against the defendant by his own declarations, made in the absence of the defendant.

The judgment of the Circuit Court is reversed, and the cause remanded.

Scott, *Judge.*—The judgment should, in my opinion, be reversed, for the second instruction given at the instance of the plaintiff.

The contract, or undertaking, assumed by that instruction, did not warrant the principle it contained. Under the contract assumed, the defendant could only be responsible for fraud.—Story on Bailment, 46.

The court improperly admitted the evidence of the declarations of plaintiff which was offered by the plaintiff himself.

Napton, *Judge.*—The special undertaking of the defendant in this case, supposing it to have been without reward, to dispose of the plaintiff's property as his own, made the defendant liable only for *gross* negligence.

It was not necessary, however, that such negligence should amount to fraud; for even in this view of his responsibility, the fact, that the defendant's property shared the fate of the plaintiff's, whilst it repels the presumption of fraud, would not in all cases excuse the defendant. (Story on Bailment, 43.) A man may, in respect to his own property, be willing to encounter extraordinary risks, or adventure upon mere gambling speculations, with a view to particular advantage, or from a natural disposition to rashness, which would be entirely unjustifiable in respect to the custody of the goods of another. (6 Rob., 316.) Thus, where, a person had a deposit of money, and put it with his own in a valise on board a steamboat, and left it there in an exposed situation all night, and it was stolen and his own money left, he was held responsible for gross negligence.—Story on Bailment, 47.

The instruction given by the court, which held the defendant bound to that degree of diligence which a prudent man would exercise about his own affairs, and which is no more nor less than what the books term ordinary diligence, was not correct on the hypothesis of a contract by defendant to dispose of the plaintiff's property *as his own.* In such a contract, the defendant was only responsible for gross negligence.

For this reason, I concur in reversing the judgment.